# United States Court of Appeals
## For the First Circuit

No. 15-1991

UNITED STATES EX REL.
MYRON WINKELMAN AND STEPHANI MARTINSEN,

Plaintiffs, Appellants,

v.

CVS CAREMARK CORPORATION ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lynch,
Circuit Judges.

Brian Wojtalewicz, with whom Wojtalewicz Law Firm, Ltd., Timothy G. Lynch, Swartz & Lynch LLP, Neil P. Thompson, Robert P. Christensen, Robert P. Christensen, P.A., James G. Vander Linden, and Levander & Vander Linden, P.A., were on brief, for appellants.
Ken Paxton, Attorney General of Texas, Jeffrey C. Mateer, First Assistant Attorney General, James E. Davis, Deputy Attorney General for Civil Litigation, Raymond C. Winter, Chief, Civil Medicaid Fraud Division, Cynthia O'Keeffe, Deputy Chief, Civil Medicaid Fraud Division, and Richard E. Salisbury, Assistant Attorney General, Civil Medicaid Fraud Division, on brief for State of Texas, amicus curiae.
Grant A. Geyerman, with whom Enu Mainigi, Craig D. Singer, Roy S. Awabdeh, and Williams & Connolly LLP were on brief, for appellees.

June 30, 2016

**SELYA**, <u>Circuit Judge</u>.  The False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, authorizes private parties to bring qui tam actions on the government's behalf alleging fraud on government programs.  Although such actions can be powerful weapons for rooting out chicanery shrouded in darkness, the FCA forbids private suits once the sun has shone on the essential features of the alleged misconduct.  Thus, courts generally must refuse to entertain FCA suits "if substantially the same allegations or transactions as alleged in the action . . . were [already] publicly disclosed" through certain enumerated sources.  <u>Id.</u> § 3730(e)(4)(A).

Applying this provision, known as the public disclosure bar, the court below determined that the complaint in this action rested on allegations that were already in the light of day.  <u>See</u> <u>United States ex rel. Winkelman</u> v. <u>CVS Caremark Corp.</u>, 118 F. Supp. 3d 412, 425 (D. Mass. 2015). Consequently, it dismissed the relators' suit.  <u>See</u> <u>id.</u>  After careful consideration, we affirm.

## I. BACKGROUND

We draw the essential facts from the relators' second amended complaint and other documents, described <u>infra</u>, that may be considered at the motion-to-dismiss stage.

The relators, Myron Winkelman and Stephani Martinsen, brought this qui tam action under the FCA and (in its current form) the analogous statutes of eleven states.  In it, they challenged

particular billing practices of CVS Caremark Corp. and certain affiliated companies (collectively, CVS). The main target of their complaint was CVS's conduct with respect to a program that the company had instituted in 2008. That program was known as the Health Savings Pass (HSP). A consumer could join the HSP program by paying a nominal enrollment fee (originally $10 and later increased to $15). HSP membership entitled a consumer, among other things, to purchase a range of generic prescription drugs from CVS at discounted prices (either $9.99 or $11.99 for a 90-day supply).

The relators assert that the HSP framework was a carefully constructed artifice that allowed CVS to fraudulently overbill Medicare Part D and Medicaid. Both of these federal healthcare programs contain conditions designed to control the cost to the government of prescription drugs. One such condition is of particular pertinence here: that condition bases payments for prescription drugs by Medicaid and Medicare on the lowest of several potential metrics, one of which is the usual and customary (U&C) price charged by a pharmacy for a given drug. See 42 C.F.R. § 403.806(d)(7) (Medicare Part D); id. § 447.512(b)(2) (Medicaid). For Medicare Part D, the federal government has promulgated a single definition of the U&C price: "the price that an out-of-network pharmacy . . . charges a customer who does not have any form of prescription drug coverage for a covered Part D drug." Id. § 423.100. Medicaid is a program that is jointly administered

- 4 -

by the federal government and the several states, so each state provides its own definition of the U&C price.[1]

The relators allege that CVS designed the HSP program to circumvent the applicable U&C requirements; that the HSP prices reflect the actual U&C prices charged by CVS under all the relevant federal and state statutes and regulations; and that CVS defrauds the government by not reporting the HSP prices as its U&C prices. They offer examples of drugs for which the U&C price reported by CVS was higher than the price charged to participants in the HSP program, allegedly leading to overpayments by Medicaid and Medicare Part D.

But the filing of the relators' action did not mark the first occasion that CVS's HSP pricing came under scrutiny. In February of 2010, a coalition of labor unions under the banner "Change to Win" issued a report comparing the HSP drug prices charged by CVS with prices charged by CVS for the same drugs to

---

[1] California, for example, defines the U&C price as the lower of "[t]he lowest price reimbursed . . . by other third-party payers in California" (with some exclusions) or "[t]he lowest price routinely offered to any segment of the general public." Cal. Welf. & Inst. Code § 14105.455(b). Massachusetts employs a slightly different definition, defining the U&C price as "the lowest price that a pharmacy charges or accepts from any payer for the same quantity of a drug on the same date of service, in Massachusetts, including but not limited to the shelf price, sale price, or advertised price of an over-the-counter drug." 130 Mass. Code Regs. 406.402. Other states offer variations on these themes. For purposes of this case, the exact parameters of these varying definitions are unimportant.

federal employees enrolled in the Federal Employee Health Benefits Program (FEHBP). The report concluded that in its role as the FEHBP's pharmacy benefits manager, CVS overcharged by "hundreds of millions of dollars." This conclusion rested primarily on the report's finding that the prices charged by CVS to the FEHBP were higher than the counterpart HSP prices for 85% of generic drugs available in both programs. News outlets pounced upon the Change to Win report and reported its findings extensively.

The allegations attracted attention in Washington as well: a Change to Win representative testified before Congress in late February of 2010 and advocated revising the FEHBP prescription drug program. In November of 2010, a Congressional Research Service (CRS) report rehearsed some of Change to Win's allegations.

Meanwhile — after the issuance of the Change to Win report but before the issuance of the CRS report — Connecticut altered its statutes to explicitly require CVS to take its HSP prices into account in its dealings with the state's Medicaid program. CVS responded by threatening to end the HSP program in Connecticut. Battling back, the Attorney General of Connecticut announced that he had subpoenaed CVS to obtain details related to the administration of the HSP program. In a press release, issued in June of 2010, the Attorney General vouchsafed that:

> CVS Caremark's actions are at odds with other pharmacies that have extended their discount program drug pricing

to the state Medicaid program and may be inconsistent with CVS Caremark's actions in other states.

Under the Health Savings Pass program, consumers pay $10 a year to fill a 90-day prescription of one of 400 generic drugs for $9.99 and receive other benefits. State law requires pharmacies to charge Medicaid the lowest drug price they offer consumers, which the state says obligates CVS to provide the Health Savings Pass discount, potentially saving taxpayers millions of dollars.

CVS disagreed, prompting the General Assembly to approve a law in the last session clarifying the requirement. CVS responded by threatening to end its Health Savings Pass program in Connecticut.

The press release highlighted the fact that CVS was continuing to offer the HSP program to consumers in other states. It declared that CVS "has an obligation to charge the state of Connecticut the same discounted price for drugs for Connecticut Medicaid recipients that CVS Caremark charges to customers enrolled in the [HSP] pharmacy discount program." The ensuing subpoena sought information about how HSP prices "compared to those billed Connecticut's Medicaid program," CVS's costs for those medications, the details of HSP enrollment in Connecticut, and information about states in which the program operated.

The Attorney General's activities attracted appreciable media attention, and all of the significant information contained in the press release was replicated in the ensuing media coverage. The media also reported CVS's response, including the company's

assertion that Connecticut's Medicaid regulations did not require CVS to pass on HSP prices to the state Medicaid program.

It was not until August of 2011 — over a year after the outpouring of publicity regarding CVS's refusal to give Connecticut the benefit of its HSP pricing — that the relators brought this suit. The relators filed an amended complaint in March of 2013, and a second amended complaint in June of 2014. These various iterations of the complaint were kept under seal while the federal government and the designated states considered whether to intervene. See 31 U.S.C. § 3730(b)(2).

Once the United States and all the states named in the second amended complaint had declined to intervene, the district court unsealed the action on August 11, 2014. See id. CVS then moved to dismiss. See Fed. R. Civ. P. 12(b)(1), (6). Its flagship claim was that the publicity surrounding the Change to Win initiative and the actions of the Connecticut Attorney General triggered the FCA's public disclosure bar. The relators opposed the motion. After briefing and argument, the district court found the public disclosure bar dispositive and dismissed the action. See Winkelman, 118 F. Supp. 3d at 425. This timely appeal followed.

## II. ANALYSIS

On appeal, the relators insist that the disclosures surrounding the Change to Win report and the Connecticut

controversy do not suffice to trigger the public disclosure bar. We divide our treatment of their asseverational array into three segments. First, we clear some procedural underbrush affecting the scope of the relevant record. Second, we determine whether a public disclosure occurred and, if so, whether that disclosure limned a fraud substantially similar to the one alleged in the complaint. Finally — having concluded that the public disclosure bar is in place — we analyze whether the relators qualify for an exception to that bar as original sources.

## A. **The Scope of the Record.**

Our standard of review is clear: we engage in a de novo canvass, accepting as true the well-pleaded facts and drawing all reasonable inferences in the non-movant's favor. See McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006). What is less clear, however, is the scope of the relevant record. We briefly explain this quandary and craft a solution.

The FCA contains qui tam provisions that allow private persons, called relators, to bring civil suits on behalf of the United States against those alleged to have knowingly submitted false claims to the federal government. See 31 U.S.C. § 3730(b)(1). If such a suit succeeds, the relator earns a share of the proceeds. See id. § 3730(d). Though this statutory paradigm has the salutary purpose of encouraging the disclosure of fraudulent schemes, it also creates perverse incentives for

- 9 -

opportunists to seek compensation based on fraud already apparent from information in the public domain. Although not every application of the public disclosure bar involves this sort of opportunistic behavior, the bar is an especially apt means of "foreclos[ing] qui tam actions in which a relator, instead of plowing new ground, attempts to free-ride by merely repastinating previously disclosed badges of fraud." United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 53 (1st Cir. 2009).

The contours of the public disclosure bar underwent some alterations during the period covered by this action. Prior to 2010, the pertinent provision stated that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions" from any one of several enumerated sources. 31 U.S.C. § 3730(e)(4)(A) (2009). This explicit jurisdiction-stripping language spoke directly to the subject matter jurisdiction of the court. See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 467-68 (2007). Consequently, motions to dismiss premised on the public disclosure bar were adjudicated under Rule 12(b)(1). See United States ex rel. Poteet v. Bahler Med., Inc., 619 F.3d 104, 109 (1st Cir. 2010); Ondis, 587 F.3d at 53, 54.

This approach was made questionable by the Patient Protection and Affordable Care Act (PPACA), Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119 (2010), which reshaped the contours

of the public disclosure bar to provide in pertinent part that "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed."[2]  31 U.S.C. § 3730(e)(4)(A).

Here, the parties dispute whether the reconfigured public disclosure bar is jurisdictional.  The district court, citing decisions from several of our sister circuits, concluded that it is not.  See Winkelman, 118 F. Supp. 3d at 420 (citing, inter alia, United States ex rel. Osheroff v. Humana, Inc., 776 F.3d 805, 810-11 (11th Cir. 2015); United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 916 (4th Cir. 2013), cert. denied, 135 S. Ct. 2376 (2015)).  The court noted that the Supreme Court has cautioned against reading statutes as jurisdictional in the absence of a clear legislative statement to that effect, see Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); that Congress deliberately removed jurisdiction-stripping language from the reconfigured public disclosure bar; and that the amended provision permits the government, for the first time, to block a dismissal despite earlier public disclosures (a circumstance that

_____

[2] The PPACA amendments likewise altered the list of enumerated sources for disclosure.  Those alterations make no difference here: under both versions of the statute, reports in the "news media," as well as disclosures in congressional hearings and federal reports, are within the statutory sweep.  Compare 31 U.S.C. § 3730(e)(4)(A)(ii), (iii), with id. § 3730(e)(4)(A) (2009).

- 11 -

— if the public disclosure bar remained jurisdictional — would contravene the cardinal principle that "parties cannot confer subject-matter jurisdiction on a district court by . . . acquiescence," Trenkler v. United States, 536 F.3d 85, 96 (1st Cir. 2008)).

Although we find the district court's analysis impressive, we recognize that appellate courts should not rush to resolve questions of statutory interpretation when it is not necessary to do so. That maxim is especially appropriate where, as here, the statutory change straddles the relevant events and, thus, presents potential retroactivity concerns. See May, 737 F.3d at 915-16. At any rate, we need not resolve this jurisdictional question. The parties note only two aspects of the case that might turn on whether or not the public disclosure bar is jurisdictional.

The first aspect hawked by the relators is a red herring. They suggest that if the public disclosure bar is no longer jurisdictional, then it must be viewed as an affirmative defense. Building on this foundation, they argue that an affirmative defense cannot be resolved at the motion-to-dismiss stage. But even accepting the premise of the relators' suggestion, their conclusion is wrong: an affirmative defense may serve as a basis for dismissal under Rule 12(b)(6). See Banco Santander de P.R. v.

Lopez-Stubbe (In re Colonial Mortg. Bankers Corp.), 324 F.3d 12, 16 (1st Cir. 2003).

Second, CVS contends that a determination as to whether the public disclosure bar is jurisdictional may affect the scope of the relevant record. This concern affects two declarations submitted by the relators as part of their opposition to the motion to dismiss, which could be considered in evaluating the existence of jurisdiction under Rule 12(b)(1). See Aguilar v. ICE, 510 F.3d 1, 8 (1st Cir. 2007). However, the relators' decision to attach these declarations to their opposition to a motion to dismiss leaves them outside the scope of the pleadings — and, thus, outside the compass of the record under Rule 12(b)(6). See Rodi v. S. New England Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004). But there is no need to let the tail wag the dog: rather than deciding the jurisdictional question in order to determine whether these two documents are part of the relevant record, we assume (favorably to the relators) that these declarations are properly before us. Indulging this assumption permits us to bypass the jurisdictional question[3] — and the assumption is practicable because, in the end,

_____

[3] Even though we do not pass upon the question of whether Congress has stripped the public disclosure bar of its jurisdictional character, the arguments for that proposition are strong. Forewarned is forearmed, and future litigants would be well-advised to ensure that facts upon which they rely in connection with the adjudication of a motion to dismiss that implicates the public disclosure bar come within the scope of the record cognizable under Rule 12(b)(6).

the declarations make no difference to the result that we must reach.

We add a coda. The press release, news articles, CRS report, and record of congressional testimony are properly before us regardless of whether the public disclosure bar is jurisdictional. After all, even within the Rule 12(b)(6) framework, a court may consider matters of public record and facts susceptible to judicial notice. See In re Colonial Mortg. Bankers, 324 F.3d at 15-16. Here, the district court, at CVS's request and without objection, took judicial notice of the proffered press release, news articles, CRS report, and record of congressional testimony. See Winkelman, 118 F. Supp. 3d at 417 n.2, 421 n.6, 422. This praxis is fully consistent with the approach of our sister circuits, which routinely have considered undisputed documents provided by the parties in connection with Rule 12(b)(6) motions based on the public disclosure bar. See United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC, 812 F.3d 294, 301 & n.7 (3d Cir. 2016); Osheroff, 776 F.3d at 811-12, 811 n.4; United States ex rel. Kraxberger v. Kan. City Power & Light Co., 756 F.3d 1075, 1083 (8th Cir. 2014).

## B. **The Public Disclosure Bar.**

As we already have noted, the public disclosure bar forecloses a qui tam action "if substantially the same allegations or transactions as alleged in the action . . . were publicly

- 14 -

disclosed" in a list of enumerated sources. 31 U.S.C. § 3730(e)(4)(A). In applying this provision, we examine whether the allegations or transactions identified in the relators' complaint have already been publicly disclosed. See Ondis, 587 F.3d at 53. If so, we then examine whether that disclosure occurred through one of the statutorily prescribed methods. See id. And if these two queries yield affirmative answers, we proceed to examine whether the allegations or transactions on which the relators' suit rests are substantially the same as the publicly disclosed allegations or transactions.[4] See id.

The relators do not contest that the materials cited by CVS appeared in statutorily enumerated sources. They argue, however, that there was no public disclosure of the relevant allegations or transactions and that the disclosures upon which CVS relies did not reveal allegations or transactions that were substantially the same as those that anchored their complaint. Their fallback position is that, in all events, their action evades

---

[4] This formulation mirrors the revised language contained in the post-PPACA version of the FCA. But this changed formulation has no substantive effect in this case. After all, we had interpreted the earlier version of the provision (which referred to allegations "based upon" earlier public disclosures) to require public disclosures that were "substantially similar" to the allegations or transactions contained in the complaint. See Poteet, 619 F.3d at 114; Ondis, 587 F.3d at 58. The revised statutory language — "substantially the same" — merely confirms our earlier understanding.

the public disclosure bar because they meet the statutory definition of "original source." 31 U.S.C. § 3730(e)(4)(B).

As a general matter, a "public disclosure occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain." Ondis, 587 F.3d at 54. This type of disclosure can occur in one of two ways: either through "a direct allegation of fraud" or through the revelation of "both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud." Poteet, 619 F.3d at 110. These sets of facts may originate in different sources, as long as they "lead to a plausible inference of fraud" when combined. Ondis, 587 F.3d at 54. The ultimate inquiry, of course, is whether the government has received fair notice, prior to the suit, about the potential existence of the fraud. See Dingle v. BioPort Corp., 388 F.3d 209, 214 (6th Cir. 2004).

In the relators' words, the true state of affairs was that "CVS was illegally refusing to charge the Medicaid and Medicare programs its true U&C lower prices, in multiple states, and was hiding that fact." The misrepresented state of affairs, they allege, grew out of CVS's false assertion that it "was giving its U&C prices to the Medicaid and Medicare programs." They add that, prior to the institution of their suit, no public disclosure of either set of facts occurred.

This disclaimer rings hollow when the Connecticut publicity is factored into the mix.[5] The Attorney General's press release, parroted in the subsequent news articles, made manifest the state's belief that its then-existing regulations mandated that CVS provide Medicaid with "the lowest drug price" that CVS was offering to consumers, which the state contended was the HSP price. This cutting of corners, the Attorney General contended, meant that taxpayers missed out on savings potentially amounting to "millions of dollars." Nor was CVS's stubborn refusal to treat HSP prices as U&C prices in doubt. The press release and resulting media coverage dwelt, with conspicuous clarity, upon CVS's persistent practice of not giving Medicaid the HSP price. Indeed, once the Connecticut legislature amended its Medicaid statutes to mandate that CVS provide the HSP prices to the state's Medicaid program, CVS threatened to end the HSP program entirely.

On this record, it requires hardly an inferential step to connect the allegedly true and allegedly misrepresented facts. The publicly disclosed materials revealed, quite plainly, that CVS was not providing its HSP price as its U&C price to Connecticut's Medicaid program. That is precisely why the Connecticut

---

[5] For ease in exposition, we limit our ensuing analysis to the publicity surrounding the Connecticut dispute. While the Change to Win publicity strengthens the case for applying the public disclosure bar, the Connecticut publicity alone suffices to prove the point.

legislature essayed a statutory fix. See Conn. Gen. Stat. § 17b-226a. So, too, those materials revealed Connecticut's belief that the HSP prices should have been provided to the state's Medicaid program even before the statutory change. The allegations and transactions that comprised the essential elements of the claimed fraud were in plain sight after these disclosures.

In an effort to resist this conclusion, the relators submit that the Connecticut disclosures showed only a price gouging scheme, not a scheme to defraud Medicaid and Medicare Part D. This quibbling is unavailing: the public disclosure bar contains no requirement that a public disclosure use magic words or specifically label disclosed conduct as fraudulent. See United States ex rel. Advocates for Basic Legal Equal., Inc. (ABLE) v. U.S. Bank, 816 F.3d 428, 432 (6th Cir. 2016). "A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." United States ex rel. Findley v. FPC-Boron Emps.' Club, 105 F.3d 675, 688 (D.C. Cir. 1997); accord A-1 Ambul. Serv., Inc. v. California, 202 F.3d 1238, 1245 (9th Cir. 2000). Enough was revealed in the Connecticut disclosures to put the government on notice of the potential fraud without the aid of these relators.

The relators next asseverate that the earlier disclosures do not unmask "substantially the same allegations or

transactions" as the scheme identified in their complaint. This asseveration, too, lacks force.

In evaluating substantial similarity, an inquiring court should bear in mind the core purpose of the FCA: to encourage suits by individuals with valuable knowledge of fraud unknown to the government. See Ondis, 587 F.3d at 58. The public disclosure bar safeguards this interest because "[w]hen the material elements of a fraud are already in the public domain, the government has no need for a relator to bring the matter to its attention." Id. It follows logically, we think, that a complaint that targets a scheme previously revealed through public disclosures is barred even if it offers greater detail about the underlying conduct. See Poteet, 619 F.3d at 115.

These principles control here. The relators describe their complaint as "focus[ing] on the CVS retail pharmacies and alleg[ing] that when CVS submitted claims to Medicaid and Medicare Part D it illegally and knowingly did not give the HSP discount prices to the governments and did not report the HSP prices as the U&C [prices]." But this was not new ground: the anatomy of this scheme was comprehensively revealed in the Connecticut disclosures. Those disclosures openly discussed the HSP program, its inexpensive pricing arrangement, CVS's unwillingness to provide the HSP prices in its dealings with Connecticut Medicaid, and the state's belief that CVS was required to do so.

- 19 -

The relators labor to distinguish their complaint from the public disclosures by emphasizing its breadth: the Medicare Part D program was never mentioned in the Connecticut disclosures, nor did those disclosures aver that CVS was allegedly playing fast and loose with the Medicaid program in other states. This argument elevates form over substance. When it is already clear from the public disclosures that a given requirement common to multiple programs is being violated and that the same potentially fraudulent arrangement operates in other states where the defendant does business, memorializing those easily inferable deductions in a complaint does not suffice to distinguish the relators' action from the public disclosures.

So it is here. The public disclosures spelled out the workings of the alleged scheme in the context of the Connecticut Medicaid program. The relators' complaint described the same alleged scheme — and the scheme worked in essentially the same way under both Medicare Part D and the range of other state Medicaid programs. Because the complaint targets the same fraudulent scheme that was laid bare in the Connecticut disclosures, the identification of additional government programs does nothing more than add a level of detail to knowledge that was already in the public domain. See United States ex rel. Bogina v. Medline Indus., Inc., 809 F.3d 365, 370 (7th Cir. 2016). That is not enough to duck the public disclosure bar.

The relators' attempt to gain traction from our decision in United States ex rel. Estate of Cunningham v. Millenium Laboratories of California, Inc., 713 F.3d 662, 672-76 (1st Cir. 2013), does not get them very far. Cunningham turned on the entirely unremarkable proposition that allegations of fraud distinct from previous disclosures are not blocked by the public disclosure bar. That proposition is inapposite where, as here, the fraud alleged is substantially the same as the one previously disclosed.

To say more on this point would be supererogatory. We hold that the essential elements of the transactions and events underlying the relators' allegations were publicly disclosed in the course of the earlier Connecticut dispute and that the scheme depicted in those earlier disclosures was substantially the same as the scheme depicted in the relators' complaint. Thus, unless an exception applies — a question to which we next turn — the public disclosure bar pretermits the relators' action.

## C. **The Original Source Exception.**

The relators claim that their action nevertheless survives under the original source exception to the public disclosure bar. See 31 U.S.C. § 3730(e)(4)(A)-(B). Congress altered the definition of "original source" as part of the PPACA

amendments in 2010.[6]  For the first time, the statute provides alternative original source definitions based on the timing of the public disclosure.  First, a relator who "prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" is considered an original source.  Id. § 3730(e)(4)(B)(i). The relators do not contend that they meet this definition. Instead, they seek refuge in a narrower second category of original sources:  individuals who, despite not having provided their information to the government prior to a public disclosure, nonetheless possess "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and have "voluntarily provided the information to the Government before filing an action under this section."  Id. § 3730(e)(4)(B)(2).

It follows that relators who do not come forward until after a public disclosure has occurred face additional hurdles to original source status.  In this instance, the relators' attempt to assume the mantle of original source status cannot clear the

---

[6] The parties have agreed, both before the district court and on appeal, that the current version of the original source exception applies to this case, and they have pitched their arguments accordingly.  We therefore do not address the pre-amendment version of the provision.

"materially adds" hurdle (and, thus, we do not address the "independent knowledge" hurdle).

The meaning of the "materially adds" language in the original source exception is a matter of first impression for this court. At its most abecedarian level, an addition is material if it is "[o]f such a nature that knowledge of the item would affect a person's decision-making," or if it is "significant," or if it is "essential." Black's Law Dictionary, 1124 (10th ed. 2014); see ABLE, 816 F.3d at 431. This dictionary definition comports with the common law understanding of "material," which focuses the relevant inquiry on whether a piece of information is sufficiently important to influence the behavior of the recipient. See Universal Health Servs., Inc. v. United States ex rel. Escobar, ___ S. Ct. ___, ___ (2016) [No. 15-7, slip op. at 14-15]. As such, our task is to ascertain whether the relators' allegedly new information is sufficiently significant or essential so as to fall into the narrow category of information that materially adds to what has already been revealed through public disclosures. As the level of detail in public disclosures increases, the universe of potentially material additions shrinks.

The question of whether a relator's information "materially adds" to public disclosures often overlaps with the questions of whether public disclosure has occurred and, if so, whether the relator's allegations are substantially the same as

those prior revelations.  See Cause of Action v. Chi. Transit Auth., 815 F.3d 267, 283 (7th Cir. 2016); Osheroff, 776 F.3d at 815-16.  Despite this potential for overlap, though, the "materially adds" inquiry must remain conceptually distinct; otherwise, the original source exception would be rendered nugatory.  See Moore, 812 F.3d at 306; cf. United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 25 (1st Cir. 2009) (explaining, under pre-amendment version of the original source exception, that a relator may sometimes provide "different information of the publicly disclosed fraud . . . of great significance," especially when the public disclosures themselves rely on uncertain or unavailable information).

In the case at hand, the relators muster a host of arguments in support of their claim to original source status. These arguments draw on both their complaint and the declarations submitted as part of their opposition to CVS's motion to dismiss. We slice these arguments into four quadrants and engage them separately.

The first slice need not detain us.  The relators recycle their arguments about the presence of the fraud in other states and under Medicare Part D as a basis for claiming that they have materially added to the public disclosures.  We rejected those self-same arguments in determining that the complaint alleges a scheme substantially the same as that revealed by the public

disclosures, and the relators' arguments are no more persuasive in the original source context. The public disclosures revealed that CVS operated its HSP program in multiple states and was fiercely resistant to the idea that HSP prices had to be provided to government healthcare programs. The relators cannot plausibly claim to have materially added to that knowledge.

The relators' second argument focuses on the temporal scope of the alleged fraud. They say that they have supplied original information indicating that CVS's fraud continued after the company's 2010 dispute with Connecticut.[7] This claim is meritless: the public disclosures left no doubt about CVS's insistence that its HSP prices should not be considered when calculating U&C prices. Given this publicly disclosed fact, there was every reason to think that CVS's scheme would remain velivolent elsewhere past the date of the Connecticut cut-off. Under these circumstances, simply asserting a longer duration for the same allegedly fraudulent practice does not materially add to the information already publicly disclosed. See Cause of Action, 815 F.3d at 281-82.

---

[7] One relator, Winkelman, suggests that he qualifies as an original source because he has provided information about CVS's failure to offer U&C prices to the government prior to the inception of the HSP program. Even if true, this is beside the point: the scheme articulated in the complaints focuses entirely on CVS's actions with respect to HSP prices.

Third, the relators trumpet their personal knowledge of specific instances of alleged overbilling. For example, Winkelman says that, while conducting claim audits, he "observed that CVS's reported U&C prices were higher than its discount plan HSP prices." Similarly, Martinsen says that she has provided specific examples of overpaid claims at the retail level and that she personally contacted Medicaid and Medicare Part D payors to confirm that they were paying more than the HSP prices for drugs included in their programs. But the public disclosures made it crystal clear that CVS was not providing its HSP prices to Medicaid and, by extension, to Medicare Part D. Offering specific examples of that conduct does not provide any significant new information where the underlying conduct already has been publicly disclosed.

The relators' last argument involves Martinsen's importuning that she has provided critical evidence of CVS's intent to defraud the government — evidence gleaned from her experience as a pharmacist at a CVS store in Minnesota. This evidence, she says, demonstrates that the HSP program was really a cover for an open-ended offer of discounts to the general public. To substantiate this claim, she asserts that CVS never tried to enforce the program requirements; that CVS did not train employees in the workings of the program; that it had no system for filing HSP enrollment forms; that its computer programming was tailored

- 26 -

to facilitate the scheme; and that HSP customers made up the largest share of CVS's prescription drug purchasers.

We do not rule out the possibility that furnishing information that a particular defendant is acting "knowingly" (as opposed to negligently) sometimes may suffice as a material addition to information already publicly disclosed. See 31 U.S.C. § 3729(b)(1). Here, however, the public disclosures made it pellucid that CVS was acting deliberately, and that its course of conduct was studied (not merely careless). Accordingly, the allegations gleaned from Martinsen's experience add nothing significant about CVS's knowledge: every indication from the public disclosures was that CVS was fully aware that it was refusing to provide its HSP prices to the Connecticut Medicaid program prior to the legislative change — and, indeed, adopted this firm position in spite of known doubts about whether this conduct was legal.

Martinsen's additional information merely confirms this state of affairs. At most, her allegations add detail about the precise manner in which CVS operated the HSP program, and a relator who merely adds detail or color to previously disclosed elements of an alleged scheme is not materially adding to the public disclosures. See ABLE, 816 F.3d at 432.

That ends this aspect of the matter. Because the relators offer no new information that materially adds to what

previously appeared in public disclosures, they do not qualify as original sources.

## III. CONCLUSION

The short of it is that the relators' suit depicts a scheme that was publicly disclosed before the filing of their complaint. That scheme is substantially the same as the scheme delineated in publicly disclosed materials. And because the relators have proffered nothing that materially adds to the publicly disclosed information, they are not "original sources" as that term is used in the jurisprudence of the FCA.[8]

We need go no further.[9] For the reasons elucidated above, we find that the sun has set on the relators' claims: the public disclosure bar forbids their suit.

**Affirmed.**

---

[8] Even though our analysis has been confined to the FCA, the state statutes identified in the relators' complaint, without exception, contain provisions similar to the FCA's public disclosure bar. The relators do not argue that any of these state versions of the public disclosure bar operate differently than the FCA's public disclosure bar. Thus, our reasoning requires us to affirm the dismissal of the relators' action in toto.

[9] In an abundance of caution, CVS has identified other grounds that, in its view, would support dismissal of the complaint. Because we find the public disclosure bar dispositive, we take no view of the efficacy of any of these alternative grounds.